## The People on the relation of William A. Butler and another v. The Board of Supervisors of Saginaw County.

*Saginaw county drain orders: Petition for mandamus.* The holders of Saginaw county drain orders applied to the supervisors of that county, in general terms, to levy a tax, as required by the act of 1871 *(Sess. L. 1871, Vol. 3, p. 92),* providing for the payment of the expenses of certain ditches made under the drain laws in that county, and, upon their refusal, filed their petition in this court for a *mandamus* to compel them to do so. This petition is general as to all the ditches, and does not separate the case of one or more from the rest, or show what fund their orders were drawn against, or what ditches they had reference to :—

*Held,* That the relators, under such petition, assume the burden of showing that the supervisors should have levied the tax for all the drains; and if insuperable objections exist to a tax for one out of all, the writ must be denied.

A petition for *mandamus* must show a clear legal duty resting upon the persons or tribunal against whom the remedy is sought, which they refuse on request to perform; and it does not show this, if the request embraces any thing which it would be illegal for them to do.

*Legislative power:*    *Curative act.*    The legislature may cure, retrospectively, defects caused by errors in similar proceedings within certain limits (see *People v. Supervisors of Ingham Co., 20 Mich., 95.* and *Hart v. Henderson, 17 Mich., 218*); but it cannot make valid, retrospectively, what it could not originally have authorized.

*Statute construed.* The act in question does not purport to be a curative statute, or profess to validate the previous proceedings. It does not recite any errors, or irregularities; it assumes to correct nothing; it does not purport to be passed because there were any which needed correction. The purpose of it seems to be to avoid the effect of certain decisions of the circuit court for Saginaw county, not by directly and in terms setting them aside, but by a direction to the board of supervisors, which, in its effect, is of equivalent import.

*Judicial power:    Legislative power.*    The line which separates judicial from legislative authority is clear and distinct. The legislature is not authorized to

exercise any portion of the judicial power. It cannot set aside a judgment or decree, nor can it even require the judiciary to give a new hearing in a case once passed upon.

*Power of taxation.* The legislature cannot, by mere direction, impose pecuniary burdens upon the people; for, while the power to tax is plenary, taxation implies public interest; and in cases like those here under consideration. it also implies proceedings *in pais*, in some of which the tax payers have a right to take part and be heard; and any attempt to levy the burden in disregard of these principles must necessarily be inoperative.

*Taxation for private purposes illegal.* The legislature cannot authorize a tax to be levied upon any portion of the public for the construction, on private property, of a drain in which the public are not concerned. Even the owner of the land benefited, cannot be taxed to improve such a drain, unless public considerations are involved.

*Heard July 9.   Re-heard October 18.   Decided October 22.*

Application for *mandamus.*

This cause having been heard on a manuscript record and oral argument, it was ordered, in view of the importance of the questions involved, that the record be printed and the cause be re-argued on printed briefs.

*Gaylord & Hanchett* and *Ashley Pond*, for the respondents.

*D. C. Holbrook, C. A. Kent* and *Sutherland & Wheeler,* for relators.

COOLEY, J.

This is an application for a *mandamus* to compel the board of supervisors of the county of Saginaw to levy certain drain taxes. The application is resisted on the ground that the taxes are not warranted by law. The case is heard upon petition and answer.

It appears that some thirty-five drains have been constructed, or begun, in the county of Saginaw, for which orders are outstanding, and that a portion of the proceedings were had under the drain law of 1861 (*Sess. L., p. 452*), and another portion under that of 1869 (*Sess. L., Vol. 1, p. 70*). In some cases, but we do not know in how many, nor

for what particular causes, nor as regards what drains, parties concerned, when attempts were made to levy and collect taxes for the construction, filed their bills in the circuit court for the county of Saginaw, and obtained decrees for perpetual injunction. As to some of the drains, the answer in this case shows various reasons upon which the court might with propriety have based its action.

Under these circumstances the legislature of 1871 passed an act entitled, "An act to provide for paying the expense of certain ditches made under the drain laws in Saginaw county," approved March 23, 1871—*Sess. L., 1871, Vol. 3, p. 92.* The first section provides that all the orders drawn on account of any of the said ditches, shall be treated as drawn on a general drainage fund of said county, and be provided for, and paid as provided in said act; and that all claims of drain commissioners for services, and of towns and cities for contributions for the construction of certain ditches, shall be adjusted by the board of supervisors, and be paid by orders on the same fund. The second section provides that fifty per cent. of said orders shall be paid on the return of the tax rolls of 1871, and fifty per cent. on return of the tax rolls of 1872. The third section requires the board to ascertain the total cost and expenses of the ditches made and being made, and to "apportion the unpaid sum to and among the several townships in which said ditches are severally located, and such other neighboring townships, and wards in cities, or parts of townships and wards, as said board shall determine to be particularly benefited by the same, and to determine the ratable proportion of the amount necessary to pay said orders, to be raised by each; and for this purpose said board shall designate separately the territory that shall be taxed in respect to each ditch, and the amount to be raised therein in respect to said orders, and provide for the levying of the same on the

taxable property within said territory in proportion to the benefit they shall deem the property therein to derive from said ditch." The fourth section requires the board to spread one-half the amount on the tax rolls for 1871, and the other half on the tax rolls for 1872. Other sections provide the proceedings to enforce collection, and the seventh section is as follows: " If, for any cause, the levy of any of the taxes authorized by this act shall be delayed, or such taxes set aside by judicial proceedings, or rejected by the auditor general, or fail to be levied, it shall be the duty of the board of supervisors to cause the same to be re-assessed the following year on the same lands if the same can be ascertained by sufficient description, and if the tax cannot be so recovered, the same shall be re-assessed under the direction of said board, on the same lands that are liable according to the provisions of this act."

The relators are holders of some of the orders embraced by the provisions of this act, and have applied to the board of supervisors, and requested that they levy a tax, as required by said act, which the board has declined to do. The present application is to compel them to take this action.

The acts under which the orders were issued, required each to be drawn against a particular fund, which was to be raised for the construction of a particular ditch. In their petition, the relators do not separate the case of any one or more ditches from the rest, nor show what funds their orders were drawn against, or what ditches they had reference to, but they ask that the supervisors be required to execute the law as to all the drains. Their application to the supervisors was equally broad. And as with such an application, all we can do is, either to grant it or refuse it, it follows that in this case we must be able to see that the supervisors should have levied the tax for all the drains, or we must deny the relief. If objections which

are insuperable, exist to a tax for one of the drains, they are as fatal to the whole proceeding as if they existed as to all; for it is impossible for us on these papers to make distinctions by our order, and it will not be claimed that we have authority to compel the board to do an act which, without our command, they were not by law authorized to do. The relators, before they can invoke this process, must show a clear legal duty resting upon the supervisors, which they refuse on request to perform, and they do not show that, if their request embraces any thing which it would have been illegal for the supervisors to do.

The present application is based upon the act of 1871. The relators insist, as we understand their position, that, certain irregularities having existed in the proceedings for the construction of the drains, which rendered it impossible to enforce taxation to meet the expense thereof unless further legislation should be had, the act of 1871 was passed for the purpose of curing such irregularities and of legalizing the necessary taxation. And to cure defects which may occur in consequence of the mistakes and errors of officers, it is urged, is but the exercise of an ordinary and very important function of the legislative department.

The right of the legislature to cure, retrospectively, the defects caused by errors in similar proceedings, came under review in *People v. Supervisors of Ingham Co., 20 Mich., 95,* and was fully sustained. We also had occasion to consider it in *Hart v. Henderson, 17 Mich., 218,* where we endeavored to point out the limitations which circumscribe it. The whole may be summed up in a single sentence: that the legislature cannot make valid, retrospectively, what they could not originally have authorized. The doing of a void act by individuals, can confer upon the legislature no new powers.

In considering whether the act of 1871 may be sustained

on this principle, the first question that suggests itself is, whether the act is of the nature supposed. It certainly does not purport to be a curative statute, or profess to validate the previous proceedings. It does not recite any errors or irregularities; it assumes to correct nothing; it does not purport to be passed because there were any which needed correction. It is an act requiring certain taxes to be levied for the payment of certain orders. If it has any purpose or intent beyond this, it will be necessary to go back of the act in order to discover it.

If we go back of the act, we find that the immediate occasion for its passage was, that taxation to meet these orders had previously become impracticable by reason of decisions of the circuit court for the county of Saginaw in chancery, in cases regularly before it, which enjoined the proceedings as unwarranted by law. The purpose of the act would therefore seem to be, to avoid the effect of these decisions, not by directly and in terms setting them aside, but by a direction to the board of supervisors, which, in its effect, must be of equivalent import. And this phase of the legislation in question, presents what must be conceded to be a very important, as well as embarrassing question.

Now it is well settled that the apportionment of legislative power to one department of the government, will not authorize it to exercise any portion of the judicial power, which is apportioned to another department. The apportionment is, of itself, an implied prohibition upon its exercise by the legislature. That body, consequently, cannot set aside a judgment or decree, nor can it even require the judiciary to give a new hearing in a case once passed upon. The line which separates judicial from legislative authority is clear and distinct, and the principle is so well settled and understood, that it is seldom called in question, and proba-

bly not often violated except through inadvertence. A reference to a few of the many cases in which it has been applied, is made here by way of illustration merely:—*Lewis v. Webb, 3 Me., 326; Lane v. Dorman, 3 Scam., 242; Campbell v. Union Bank, 6 How., Miss., 661; Ervine's Appeal, 16 Penn. St., 266; Cash, Appellant, 6 Mich., 193; McDaniel v. Correll, 19 Ill., 226; Denny v. Mattoon, 2 Allen, 361; Budd v. State, 3 Humph., 483; Wally's Heirs v. Kennedy, 2 Yerg., 554; Picquet, Appellant, 5 Pick., 64.*

Such being the purport of the act in question, it now becomes necessary to consider whether it can be treated in any sense as a curative statute, or whether, on the other hand, it must not be regarded as being in fact, what its terms would import, an act to require that to be done which the court, in the exercise of its legitimate and exclusive authority has enjoined; whether, in other words, the act is not, in its nature, an act to reverse a judicial decision rather than an act to cure defects.

Now, it must be conceded that curative statutes do not usually assume this form, but, on the other hand, they usually point out defects, and express the legislative intention to cure them. It is not clear to our minds, that the legislature intended this as an act to cure errors. The implications are all the other way; and those to be derived from the last section, are particularly forcible, for that in express terms directs the board of supervisors, if hereafter a tax shall be enjoined, to proceed nevertheless to re-assess it. This may be merely a careless employment of language, but we must nevertheless take it into consideration, when we are desired to discover in the act a purpose different from that which it obviously imports. Instead of an intent appearing to correct defects, the implications from this act are, that the legislature supposed a direction in this form, that certain sums should be levied as taxes, would

be sufficient to legalize the steps which should be taken for that purpose. But this would be a grave error. It is not the province of any mere legislative direction to impose pecuniary burdens upon the people. The power to tax is indeed plenary; but taxation implies public interest; and in cases like these now in question, it also implies proceedings *in pais,* in some of which the tax payers have a right to take part and be heard. Any attempt to levy the burden in disregard of these principles, must necessarily be inoperative.

But if any one shall insist that this legislation is curative, he would also be called upon to show that the defects were such as were within the reach of legislation of that nature. He ought to show that they are not defects which go to the foundation of the right to tax at all in the particular case. That has not been done here, but on the contrary the answer shows that, as to some of the drains, the proceedings were wholly incapable of confirmation. It shows—and for the purposes of this application the relators admit—that some of the drains are constructed upon private property, where a right to continue and keep them open has never been obtained; that the drains are, therefore, private property. And it is averred as a fact, that they were constructed for the benefit of the lands drained, and not because the lands injuriously affected the health of the inhabitants. The admitted case is consequently, to the extent of such drains, one of purely private concern.

We shall enter upon no argument to demonstrate that a tax cannot be levied upon any portion of the public, for the construction of a drain in which the public are not concerned. Even the owner of the land benefited, cannot be taxed to improve it, unless public considerations are involved; but he must be left to improve it or not, as he may choose.

As to some of the drains, therefore, it being impossible to grant the relief prayed, and there being no possibility on this application, of separating the others from them, the writ prayed for, must be denied.

The other Justices concurred.